UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>ARMANDO GALLEGOS,<br><br>        Defendant. | Case No. 1:22-cr-00016-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Defendant Armando Gallegos's Motion to Suppress. Dkt. 26. The Government filed a response. Dkt. 32. Gallegos replied. Dkt. 42. The Court held a hearing on the Motion on June 23, 2023, and took the matter under advisement. For the reasons below, Gallegos's Motion to Suppress is DENIED.

## II. BACKGROUND

On October 20, 2020, law enforcement conducted a probation search of Rosie Jimenez's house. Jimenez was on probation and the search was a term and condition of her probation. Armando Gallegos was in the house when the search began; so were Allen Mclean (a known gang member), Lorena Molina, and Rosie Jimenez. All four individuals were detained while the search was proceeding.

Upon entering the living room where Gallegos was located, Sergeant Jason Cantrell[1] of the Nampa Police Department Gang Unit observed a wooden box labeled "Gunmaster" on a small table directly in front of Gallegos. Cantrell testified that the box indicated to him a gun was nearby and that he did not know what was in the box. Cantrell testified that he was there as an "assist officer," providing scene safety and security. While other officers searched the house and questioned Jimenez and Mclean in another room, Cantrell watched Gallegos and Molina, who were seated on a couch.

Cantrell witnessed Gallegos getting up off the couch and then sitting down again multiple times. At one point, Gallegos grabbed the Gunmaster box and stood up as if to leave, only to set the box down and return to his seat. Cantrell testified that Gallegos was nervous and clearly did not want to be there. At another point, Gallegos asked Cantrell if he could gather his belongings and leave. Cantrell told Gallegos that he (Cantrell) would need to check with the probation officer conducting the search of the home before Gallegos could go.

Yet again, Gallegos stood up, grabbed the box, and told Cantrell he needed to leave. Cantrell asked Gallegos for his name. Gallegos did not answer. Cantrell asked Gallegos what was in the box. Gallegos did not answer. Cantrell asked Gallegos if he had any weapons. Gallegos did not answer. Gallegos was wearing a dark, loose sweatshirt or hoodie. Cantrell asked Gallegos if he could search him for weapons. Gallegos did not answer. Cantrell repeated his question about searching for weapons. Again, Gallegos did

---

[1] Cantrell was the only witness that testified at the suppression hearing.

not answer.

Instead, Gallegos moved towards Cantrell while carrying the Gunmaster box. Cantrell was positioned between two couch ends and the wall creating a narrow passageway that led to the front door. Cantrell stepped towards Gallegos and, yet again, asked if he could check him for weapons. Again, Gallegos did not answer but turned slightly away. Cantrell told Gallegos to put the Gunmaster box down. He did not. As Gallegos turned, Cantrell brushed or put his hand on Gallegos's lower back. Upon touching Gallegos, Cantrell immediately felt a bulge, which he identified as a handgun.

Gallegos then began to back away from Cantrell. Cantrell grabbed at Gallegos to seize him and stop him from grabbing the gun. After Cantrell and other officers wrestled Gallegos onto the couch, Cantrell removed a handgun from Gallegos's waistline. Subsequently, Gallegos gave officers his information, and they determined he had a prior felony conviction. They then arrested Gallegos for unlawful possession of a firearm.

On February 8, 2022, a grand jury indicted him on a single charge of unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Dkt. 1.

On January 27, 2023, Gallegos filed two motions: a Motion to Dismiss Indictment (Dkt. 25)—that has been denied (Dkt. 48)—and the instant Motion to Suppress (Dkt. 26).

### III. LEGAL STANDARD

The Fourth Amendment protects citizens from unreasonable searches and seizures by the government. U.S. Const. amend. IV. Generally, searches and seizures conducted without a warrant are "per se unreasonable under the Fourth Amendment" subject to "a

few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (cleaned up).

One such exception allows officers to "detain the occupants of a home during a parole or probation compliance search." *Sanchez v. Canales*, 574 F.3d 1169, 1173 (9th Cir. 2009), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012). One reason for this exception is the need to "'minimiz[e] the risk of harm to the officers.'" *Id.* (quoting *Muehler v. Mena*, 544 U.S. 93, 98 (2005)). Still, even though officers can detain third parties present during a probation search, they are not given carte blanche to search persons simply because they are there. *United States v. Vaughn*, 718 F.2d 332, 335 n.7 (9th Cir. 1983) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91–93 (1983)). A separate determination for any search is required.

Here, the police had a legitimate right to enter the home to do a probation search. Once inside, the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep for officer safety. The issue for this motion is whether the officer justifiably placed his hand on defendant's back.

A frisk for weapons "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry v. Ohio*, 392 U.S. 1, 17 (1968). Thus, absent a warrant or other exceptions, a person may be searched only if the police have "reason to believe that they are dealing with an armed and dangerous individual." *Id.* at 27. This "reason to believe" is clearly something less than probable cause. As *Terry* states "the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess."

*Id.* at 11. That is, the search "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search, even though it remains a serious intrusion." *Id.* at 27.

## IV. ANALYSIS

The Parties' arguments breakdown on two fronts. First, they argue over a legal question—whether officers need reasonable suspicion that a defendant is both armed *and* dangerous to justify a *Terry* frisk. Second, they argue over whether Cantrell had the necessary reasonable suspicion to frisk Gallegos. The Court addresses each in turn.

### A. Requirements of *Terry* Frisk

The requirements to conduct a *Terry* frisk for officer safety are naturally found in *Terry.* There, the Supreme Court held that "a frisk of a person for weapons requires reasonable suspicion that a suspect is 'armed and presently dangerous to the officer or to others.'" *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016), *as amended* (May 5, 2016) (quoting *Terry*, 392 U.S. at 24). Thus, the Court need not wade into whether *Terry* requires an officer to have reasonable suspicion that a suspect is armed and dangerous because that is precisely what the case requires. Instead, the Court believes what the Parties are actually arguing about is how reasonable suspicion arises.

Gallegos seems to suggest that finding reasonable suspicion is a two-step process where "armed" and "presently dangerous" are independent factors. The Government, on the other hand, treats the two as indistinguishable. In other words, if officers have reasonable suspicion a person is armed, they also have reasonable suspicion that he is

dangerous, and vice versa. Both Parties only present part of the puzzle.

Reasonable suspicion is an objective standard that requires "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant'" a frisk. *Id.* at 876–77 (quoting *Terry*, 39 U.S. at 21). Mere hunches that a person is armed and dangerous do not form reasonable suspicion. *Id.* (citing *Maryland v. Buie*, 494 U.S. 325, 332 (1990)). Further, reasonable suspicion is assessed in the totality of the circumstances. *Id.* at 876. (collecting cases).

In making this assessment, relevant considerations may include:

(1) observing a visible bulge in a person's clothing that could indicate the presence of a weapon; (2) seeing a weapon in an area the suspect controls, such as a car; (3) sudden movements suggesting a potential assault or attempts to reach for an object that was not immediately visible; (4) evasive and deceptive responses to an officer's questions about what an individual was up to; (5) unnatural hand postures that suggest an effort to conceal a firearm; and (6) whether the officer observes anything during an encounter with the suspect that would dispel the officer's suspicions regarding the suspect's potential involvement in a crime or likelihood of being armed.

*Id.* at 877 (cleaned up) (collecting cases). And if an officer has less than reasonable suspicion "directed at the person to be frisked, the manner in which the officer conducts the investigation or the posing of an unjustified question concerning weapons cannot be used to create the reasonable suspicion of fear for one's safety that is required" to justify a *Terry* frisk." *United States v. Thomas*, 863 F.2d 622, 629 n.8 (9th Cir. 1988).

Connecting this all together, it becomes clear that calculating reasonable suspicion is not a two-factor formulaic formality, as Gallegos suggests, nor is it an exercise that treats armed and dangerous as indistinguishable, as the Government suggests. Instead, it requires reasonable suspicion that a person is both armed and dangerous, which is determined in

the totality of the circumstances.

**B. Reasonable Suspicion to Frisk Gallegos**

Of course, the leading case for this area of the law is *Terry v. Ohio,* 392 U.S. 1

(1968). There, the Supreme Court stated:

> [I]t is urged that distinctions should be made between a 'stop' and an 'arrest'
> (or a 'seizure' of a person), and between a 'frisk' and a 'search.' Thus, it is
> argued, the police should be allowed to 'stop' a person and detain him briefly
> for questioning upon suspicion that he may be connected with criminal
> activity. Upon suspicion that the person may be armed, the police should
> have the power to 'frisk' him for weapons. If the 'stop' and the 'frisk' give
> rise to probable cause to believe that the suspect has committed a crime, then
> the police should be empowered to make a formal 'arrest,' and a full incident
> 'search' of the person. This scheme is justified in part upon the notion that a
> 'stop' and a 'frisk' amount to a mere 'minor inconvenience and petty
> indignity,' which can properly be imposed upon the citizen in the interest of
> effective law enforcement on the basis of a police officer's suspicion.

*Id.* at 10-11. The Supreme Court adopted this distinction between "stop and frisk" and

"arrest and seizure" and their graduating requirements of reasonable suspicion for "stop

and frisk" and probable cause for "arrest and seizure." But the Court also cautioned that

"[a] search for weapons in the absence of probable cause to arrest, however, must, like any

other search, be strictly circumscribed by the exigencies which justify its initiation." *Id.* at

26.

The Government compares this case to *United States v. Flippin*, 924 F.2d 163, 165

(9th Cir. 1991), where the Circuit found the totality of circumstances justified reasonable

suspicion that a person was armed and dangerous. Because this Court agrees, a detailed

review of the facts in that case is necessary.

In *Flippin*, the police observed Ms. Flippin entering a second-hand shop followed

by her companion, Edward Donnes. A police officer stopped and questioned Donnes about a large knife he was carrying. The knife was seized and Donnes was warned not to drive because he said he had no license. The next day, Donnes was seized and taken into custody because he was driving. A search of the car revealed drug paraphernalia and a key to a motel room. An officer went to the motel room and questioned Flippin who could not produce any identification.

The next day, two officers went to the motel to try again to identify Flippin. Donnes and Flippin were in the room. The officers entered the room with consent. An officer patted Donnes down and checked his immediate area for weapons. He found none. The same officer then suggested that they look at the car registration to determine Flippin's real name. Flippin told Donnes to go get the registration. Donnes and an officer left to go to the car. The other officer remained in the room with Flippin. From the corner of his eye, he saw Flippin grab a make-up bag. She held the bag close to her and refused to relinquish it. The officer forcibly took the bag from Flippin out of fear that she was attempting to arm herself and, because the make-up bag felt heavy, he then believed it contained a loaded gun. He opened the bag and found a gun and cocaine. Flippin was arrested for possession of cocaine and her room was searched.

The district court granted Flippin's motion to suppress, ruling that the search of the bag and the room violated her Fourth Amendment rights. The district court held that the officer lacked reasonable suspicion to grab and open the bag. The government appealed. The Ninth Circuit, relying on *Maryland v. Buie,* 494 U.S. 325 (1990), and focusing on a

concern for police safety in the confines of a person's dwelling, reversed. Specifically, the

Ninth Circuit stated:

> The protective search was upheld in *Buie* because the police had a legitimate right to enter the home and once inside, the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep. This plainly implies that, following a consent entry, no probable cause predicate is needed to pat down for weapons, if it is independently justified by a reasonable suspicion that the suspect is armed.

> The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or lives of others. Police must be allowed to protect themselves before a potential threat of danger develops into a tragedy.

> The court erred in requiring probable cause for the seizure. When the police have lawfully entered a dwelling and have a reasonable suspicion that a suspect is armed, a *Terry* pat down for weapons is permissible.

*Id.* at 165–66 (cleaned up).

While writing about reasonable suspicion, the *Flippin* court stated that reasonable

suspicion is "a reasonable belief based on specific and articulable facts," and "a court must

determine whether a reasonably prudent man in the circumstances would be warranted in

the belief that his safety or that of others was in danger." The defendant's behavior is

significant in that determination. *Id.* at 166.[2]

Finally, in making the determination that the officer's belief—that his safety was in

danger—was reasonably prudent, the Ninth Circuit relied on several facts, including: (1)

the officer was alone in the room with the defendant; (2) the officer knew that on a previous

---

[2] The Ninth Circuit used the term "suspect" rather than defendant or person. However, that term is freely used by law enforcement whether the person is under investigation, a mere third party in the residence being searched, or named in a warrant. The Court sees no significance to the use of that term in *Flippin*.

day the defendant's companion possessed a large knife; and (3) defendant grabbed the bag when the officer turned away. The Circuit found that these facts showed the officer acted reasonably in suspecting that defendant was attempting to take advantage of the situation by arming herself. *Id.* at 166. The Ninth Circuit reversed the district court's grant of the motion to suppress.

Here, Gallegos argues that the officer did not have reasonable suspicion that he was armed and dangerous, so the touching of the hand to his back was unlawful, and the seized gun must be excluded, as well as any other statements he made after his arrest. He alleges that the mere presence of a Gunmaster box, which contained a gun cleaning kit, did not provide Cantrell with reasonable particularized suspicion. Further, he asserts that his course of conduct was simply that of an innocent bystander and that it did not provide reasonable suspicion that he was armed and dangerous.

The Government, on the other hand, states that the officer had reasonable suspicion Gallegos was armed because the Gunmaster box was firearm paraphernalia and was large enough for a handgun to fit inside. A reasonable person would not have known that the box contained only gun cleaning equipment. They also allege that Gallegos was acting nervous and failed to answer questions. Likewise, the Government repeatedly brings up that Cantrell could not tell if Gallegos was armed because the latter was wearing a baggy black sweatshirt. Here, looking at the totality of the circumstances, the Court finds that Cantrell did have reasonable suspicion that Gallegos was armed and dangerous.

The Ninth Circuit has already held, in *Flippin*, that a person clutching a make-up bag and refusing to relinquish it gives rise to reasonable suspicion that she is armed and

MEMORANDUM DECISION AND ORDER - 10

dangerous. Similarly, this Court determines that a person grabbing a box marked "Gunmaster" and refusing to identify its contents gives rise to reasonable suspicion that he is armed and dangerous. Further, in the totality of the circumstances, the Court also finds that the fact that Gallegos repeatedly reached for the box, refused to answer questions,[3] appeared nervous,[4] stood up and grabbed the box and approached the officer—all while in the presence of a known gang member and in the home of a probationer—supports its finding of reasonable suspicion. Likewise, the "search" conducted by the officer was very limited in nature. He merely brushed or placed his hand on the small of Gallegos's back.

Once the gun was felt, the officer had cause to continue the protective sweep by looking inside the box and patting down Gallegos. Once the officer learned Gallegos was a convicted felon with a gun, he had cause to make an arrest.

Thus, under *Flippin,* and in the totality of the circumstances, the Government has carried its burden in establishing that Cantrell had a reasonable suspicion that Gallegos was armed and dangerous.

///

///

---

[3] "'Evasive or deceptive responses' to an officer's questions about what an individual was up to" can be relevant in "assessing the totality of the circumstances." *Thomas*, 818 F.3d at 877 (citing *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010).

[4] Under Ninth Circuit precedent, police officers are not justified to conduct "a *Terry* search based on mere nervous or fidgety conduct and touching of clothing." *United States v. I.E.V.*, 705 F.3d 430, 438 (9th Cir. 2012) (cleaned up). Still, in the totality of the circumstances, courts can consider nervousness in finding reasonable suspicion. So, while the Court finds that Gallegos's nervousness contributed to its finding of reasonable suspicion, it notes that "it carrie[d] little weight because encounters with police officers are necessarily stressful for law-abiders and criminals alike." *United States v. Wrobel*, 295 F. Supp. 3d 1127, 1139 (D. Idaho 2018) (cleaned up).

## VI. ORDER

The Court HEREBY ORDERS:

1.  Gallegos's Motion to Suppress (Dkt. 26) is DENIED.

DATED: August 21, 2023

David C. Nye
Chief U.S. District Court Judge